**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger**

**Civil Action No. 11-cv-03139-MSK-KLM**

**BACKCOUNTRY HUNTERS AND ANGLERS, Colorado Chapter,**

    Petitioner,

v.

**UNITED STATES FOREST SERVICE;
MARK STILES, in his official capacity as Forest Supervisor for the San Juan National
Forest; and
THOMAS TIDWELL, in his official capacity as Chief of the United States Forest Service,**

    Respondents,

and

**COLORADO OFF-HIGHWAY VEHICLE COALITION;
TRAILS PRESERVATION ALLIANCE;
SAN JUAN TRAIL RIDERS;
PUBLIC ACCESS PRESERVATION ASS'N; and
THE BLUE RIBBON COALITION,
DUNTON HOT SPRINGS, INCL;
DUNTON, LLC, limited liability company;
TOWN OF RICO, COLORADO;
RICO ALPINE SOCIEETY; and
SAN JUAN CITIZENS ALLIANCE,**

    Respondent-Intervenors.

---

**OPINION AND ORDER ON MERITS**

---

    **THIS MATTER** comes before the Court for a determination on the merits of the

Petitioner's claims for declaratory and injunctive relief.  The Court has considered the

Petitioner's opening brief **(# 50)**, the Respondents' response brief **(# 52)**, the Petitioner's reply

1

**(# 5)**, an *amicus curiae* brief filed by Intervenors San Juan Citizens Alliance, Dunton Hot Springs, Inc., Dunton, LLC; Town of Rico, Colorado; and Rico Alpine Society **(# 53)**, and an *amicus curiae* brief filed by Intervenors Colorado Off-Highway Vehicle Coalition; Trails Preservation Alliance; San Juan Trail Riders; Public Lands Preservation Association; and The Blue Ribbon Commission **(# 54)**.[1]

## FACTS

### A. Background

This case seeks review of alleged decisions by the Respondent United States Forest Service ("USFS") concerning the use of certain specified trails within the San Juan National Forest by "off-highway vehicles" ("OHVs") – *i.e.* motorcycles.[2]

The San Juan National Forest (hereafter "the forest") comprises nearly 2 million acres of forest land, located in southwestern Colorado. The forest is divided into several Ranger Districts; the relevant one in this matter is the Dolores Ranger District. The Dolores Ranger Districts is divided into "Travel Management Areas," of which the relevant one is the Rico-West Dolores area. Zooming in even more specifically, this case concerns 14 specifically-identified trails[3] in the Rico-West Dolores area.

---

[1] Also pending is the Petitioner's Motion for Preliminary Injunction **(# 25)**. Because the Court resolves this matter on its merits, there is no need for it to separately consider preliminary injunctive relief, and thus, this motion is denied as moot.

[2] The Petitioner and others sometimes use the term "off-road vehicles" or "ORVs." The Court understands there to be no material difference between the terms.

[3] The trails in question are Bear Creek (Trail No. 607), Burnett Creek (No. 641), Calico (No. 208), Eagle Peak/Upper Stoner (No. 629), East Fall Creek (No. 646), Gold Run (No. 618), Grindstone (No. 608), Horse Creek (No. 626), Johnny Bull (No. 639), Little Bear Creek (No. 609), Priest Gulch (No. 645), Ryman Creek (No. 735), Stoner Creek (No. 625), and Wildcat (No. 207). The Petitioner states that these trails can be grouped into "two major trail networks"

The precipitating event giving rise to this case was the issuance of a June 16, 2010 Area Restrictions Order by Mark Stiles, Supervisor of the San Juan National Forest. Invoking his power to "close or restrict the use of" defined areas under 36 C.F.R. § 261.50(a), Mr. Stiles determined that "motor vehicle use in" the Rico-West Dolores Travel Management Area "will directly cause considerable adverse effects" if not restricted. Thus the June 16, 2010 Order "close[d] the Rico-West Dolores Travel Management Area to cross-country[4] travel" by motorized vehicles. However, the Order noted that it "does not affect the use of motorized vehicles . . . on motorized trails . . . ." A map accompanying the Order showed the various trails at issue here, designated with a legend denoting that they were "trails open to motorcycles only, yearlong."

The Petitioner contends that forest planning materials prohibit OHV use on some or all of the designated trails, and thus, the June 16, 2010 Order improperly opened such trails to OHV use. The Respondent contends that the trails have always been open to OHV use, both historically and under forest planning policy documents, such that the June 16, 2010 Order did nothing more than acknowledge a permissible use of the trails.

**B.  History**

To place the Petitioner's contentions in context, the Court will briefly address the history of the USFS' regulation of the area.

---

denoted as the Calico network and the Bear Creek network, with the Ryman and Stoner Creek trails being exceptions falling outside both networks.

[4]   For purposes of this decision, "cross-country" can be equated to "off-trail."

   1. The 1983 plan

The current forest management plan was drafted in 1983.[5] That plan divides the forest into Management Areas, each with a particular emphasis. The parties appear to agree that the area at issue here falls within the definition of Management Area 3A. The 1983 plan explains that the USFS' emphasis for Area 3A is "semi-primitive non-motorized recreation [such as hiking, horseback riding, hunting, cross-country skiing, etc.] in both roaded and unroaded areas." A directive with regard to Area 3A is that "the area is never open for motorized recreation activities except for specifically identified motorized corridors through the area."

   It is at this point that the parties reach their first area of disagreement. The Petitioner contends that the 1983 plan specifically identifies the "motorized corridors through the area". It points to Appendix G to the 1983 plan, which is entitled "Roads and Trails To Remain Open to the Public for Motorized Use Within Management Area 3A." It states that although "Management Area 3A is managed with emphases on . . . non-motorized recreation . . . the following roads and trails remain open to the public for motorized use as access corridor routes through the management area." A table then lists various trails by name and number including, as relevant here, Bear Creek Trail, Calico Trail, Gold Run [North] Trail, Grindstone Trial, and Little Bear Creek Trail. Thus, by negative inference, the Petitioner argues that the 1983 plan permits motorized OHV use only on the five identified trails.

   The Respondents contend that the Petitioner has misunderstood the 1983 plan. They argue that because the forest plan "does not specify any particular procedure for specifically identifying motorized corridors within Management Area 3A", motorized OHV use is not

---

[5]   The USFS is in the midst of preparing a new management plan for the forest, but the 1983 plan remains in effect in the interim and the Court does not consider what contours a new plan might take on.

4

limited to the 5 trails identified in Appendix G to the 1983 plan. The Respondents state that the practice of the USFS has been to "define 'specifically identified motorized corridors' as those roads and trails that are part of the National Forest trail system and are shown as such on maps," They point to language in a 1992 version of the forest plan that explains "Forest plans . . do not normally have sufficient detail in them to make site specific decisions for individual projects and activities,"[6] and point to a series of historical San Juan National Forest maps that show some of the trails at issue in this matter had been designated for motorized vehicle use (other trails are not mapped at all). They contend that Appendix G "was apparently intended as a public information tool and not as the defining articulation of motorized trails in Management Area 3A."

### 2. The 1992 plan

The 1983 plan was amended over succeeding years. In 1992, the USFS republished the entire 1983 plan, as modified by the amendments to that date. Among other things, the amendments converted some areas at issue here from Management Area 2A (emphasis on motorized recreation) status to Management Area 3A status.[7] The 1992 reprinting carried forward the language from the 1983 plan that lands in Area 3A were "never open to motorized recreation activities except for specifically-identified motorized corridors," but it omitted what had been previously denoted as Appendix G. Neither party points to any formal explanation of why Appendix G was omitted from the 1992 plan (*i.e.* whether it was purposeful or mere oversight), although the Petitioner seems to imply that the omission should be understood to have revoked the designation of those trails as motorized corridors.

---

[6]   The 1992 plan goes on to state that "the results of project- and site-specific evaluation are documented in project files and appropriate NEPA disclosure and decision documents."

[7]   The amendment in question noted that "topography [in the area] is too steep for motorized recreation. Current and preferred use is semi-primitive non-motorized recreation."

### 3. 1999 Closure Order

The Respondents contend that the current document controlling the authorized use of the lands at issue is a Closure Order issued by the forest's Manager on February 2, 1999. Like the June 16, 2010 Order referenced above, the 1999 Order invokes the Manager's authority to close off forest lands, and provides that "the following acts are prohibited on the areas, roads, and trails as described on the San Juan Travel Management Map (1994) . . . until further notice: . . . using the type of vehicles [on trails] listed as restricted." In other words, the 1999 Order incorporated and enforced the trail designations and accompanying restrictions as shown on the 1994 map. It appears to be undisputed that the 1994 map authorized OHV use on the trails at issue here.[8]

### 4. 2005 Travel Regulation and 2009 Travel Management Plan

In compliance with presidential executive orders requiring agencies to develop comprehensive plans for use of OHVs on public lands, in 2005, the USFS created regulations requiring each unit to specifically designate the permitted use(s) for each of its trails in a "Travel

---

[8] The Court confesses some uncertainty as to the precise contents of the 1994 map. The only citation to it in the parties' briefing is found in the first sentence in the Respondent's brief, but that citation appears to be a typographical error, referring to page 4894 of the record, which is an interstitial page of text as part of a larger document. The Court has located one map in the record bearing a date of 1994, at page 4867, but it is not completely clear whether this map, or some other, is the one referenced in the 1999 Order.

Assuming this is the map in question, it designates certain trails – *e.g.* Priest Gulch, Calico, Bear Creek, Grindstone, and Little Bear Creek – with a thick, broken orange line. The map legend indicates that such trails are subject to the restrictions on a "road and trail table." The referenced "road and trail table" appears to be reproduced as an attachment to the 1999 Order. If the Court understands the mapping conventions correctly, the trails designated with a thick orange line are classified as restriction level 4, which provides that they are open to "yearlong" use by motorcycles and all-terrain vehicles.

Other trails, such as Johnny Bull, are designated with ordinary thin, broken black lines, apparently making them subject to restrictions listed on an "area table." That table also appears to accompany the 1999 Order. It appears that all of the remaining trails at issue here fall into restriction category F, making them open to all motorized uses.

Management Plan." 36 C.F.R. § 212.51(a). In 2009, the Rico-West Dolores area completed its plan, designating all of the trails at issue herein as being subject to OHV use. However, several parties (including the Petitioner) appealed the decision to adopt the plan, and in December 2009, a USFS Appeals Officer held that the plan did not "provide sufficient information to support" the decision in various respects.[9] The Appeals Officer reversed the decision, sending it back to the San Juan National Forest Manager for further consideration. To date, no new Travel Management Plan for the lands at issue here has been issued.

## ISSUES

The Petitioner seeks declaratory and injunctive relief, in the form of setting aside the June 2010 Order, on the following grounds (all nominally premised on the notion that action in contravention of law constitutes arbitrary and capricious action in violation of 5 U.S.C. § 702(6)(a)): (i) that the USFS failed to conduct an analysis required by the National Environmental Policy Act ("NEPA"), 42 U.S.C § 4332(2)(C); (ii) that the USFS was required to supplement any existing Environmental Impact Statement ("EIS") under NEPA in light of the Petitioner's demonstration that ongoing OHV use was causing damage to trails; (iii) that the authorization of OHV on the trails at issue violates the 1992 plan and thus constitutes a violation of the National Forest Management Act ("NFMA"), 16 U.S.C. § 1604(i); (iv) that the authorization of OHV use on the trials violates Executive Order 11,644 and the requirements of 36 C.F.R. § 212.55(b), by designating trails as OHV-authorized in violation of the criteria stated therein; and (v) that the authorization of OHV use violates Executive Order 11,989, insofar as it requires the USFS to close trails that are being damages by OHV use.

---

[9] The Petitioner points out that one reason for reversal recommended by the USFS, and apparently tacitly adopted by the Appeals Officer, was that designation of all of the trails for OHV use would violate the 1983 plan.

Thus, it may be stated that the Petitioner's challenges fall into two groupings: (i) challenges pertinent to the June 2010 Order; and (ii) challenges related to the Respondents' failure to close the trails upon being advised (by the Petitioner and others) that motorized use of the trails was causing significant environmental damage.

With regard to the June 2010 Order, the Petitioner's position is that OHV use of the trails has been prohibited by the 1983 plan (except perhaps as may have once been permitted by Appendix G), affirmed in the 1992 plan (and arguably, removing the authorization for motorized use on even those trails formerly listed in Appendix G), that the 1999 Order was invalid as inconsistent with the 1983/1992 plan, and that the June 2010 Order suffers from the same defect. The Respondents contend that the June 2010 Order did nothing more than reflect the *status quo* authorizing OHV use of the trails at issue by virtue of the 1999 Order and perhaps even earlier than that.

With regard to the Respondent's alleged failure to take action to close the trails, the Petitioner contends that it has provided evidence to the Respondents that motorized use of the trails in question has caused and is causing significant adverse environmental effects. As a consequence, the trails must be closed to OHV use until such damage can be remediated. The Respondents respond that they have investigated the damage cited by the Petitioners and has found it to be insignificant, such that closure of the trails to OHVs is not warranted.

## ANALYSIS

### A. Statutory background

The Court will summarize, briefly, the particular statutes invoked by the Petitioner and their requirements.

       1.  Administrative Procedures Act

The Petitioner's claims all derive from the Administrative Procedures Act ("APA") found at 5 U.S.C. § 701, *et seq*. Under 5 U.S.C. § 702, "a person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. . . ." In turn, judicial review is governed by 5 U.S.C. § 706, which provides that a court reviewing an agency's action shall:

> (2) hold unlawful and set aside agency action, findings, and conclusions found to be--
>
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . or
>
> (D) without observance of procedure required by law; . . .

A court may affirm an agency's decision only "on the grounds articulated by the agency itself." *Olenhouse v. Commodity Credit Corp.,* 42 F.3d 1560, 1565 (10th Cir. 1994). "After-the-fact rationalization by counsel in briefs or argument will not cure noncompliance by the agency[.]" *Id.* at 1575.

The Supreme Court instructs in *Motor Vehicle Manufacturers Association of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983):

> [A]n agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

As noted above, the focus is upon the rationality of the decision making process, not upon the wisdom of the decision itself. *Olenhouse,* 42 F.3d at 1575.

A court must determine whether there was a clear error in the agency's judgment. *Id.* at 1574; *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416 (1971), *overruled on other grounds*, *Califano v. Sanders,* 430 U.S. 99, 105 (1977). In doing so, a court does not substitute its judgment for that of the agency. *Citizens to Preserve Overton Park, Inc.,* 401 U.S. at 416. It is not the court's role to weigh conflicting evidence or evaluate credibility. *See Pennaco Energy, Inc. v. United States Dept. of Interior,* 377 F.3d 1147, 1159 (10th Cir. 2004). Indeed, even when the administrative record contains evidence which arguably conflicts with the agency's findings, it does not necessarily render the agency's decision arbitrary and capricious. *See id.* Nor is it the court's function to decide the propriety of competing methodologies. *See Silverton Snowmobile Club v. United States Forest Service,* 433 F.3d 772, 782 (10th Cir. 2006).

Review of an agency's decision is usually deferential. *See Citizens' Committee to Save Our Canyons v. U.S. Forest Service,* 297 F.3d 1012, 1021 (10th Cir 2002). The deference given "is especially strong where the challenged decisions involve technical or scientific matters within the agency's area of expertise." *Utah Environmental Congress v. Bosworth,* 443 F.3d 732, 739 (10th Cir. 2006). If the agency's exercise of discretion is truly informed, then the court defers to it. *Utah Shared Access Alliance v. United States Forest Service,* 288 F.3d 1205, 1213 (10th Cir. 2002). However, if the record shows that the agency prejudged the issues, then any deference to the agency's decision is reduced. *See Davis v. Mineta,* 302 F.3d 1104, 1112 (10th Cir. 2002).

    2. NEPA

The purpose of NEPA is to require agencies to pause before committing resources to a project to consider the likely environmental consequences of a decision, as well as of reasonable alternatives to it. *Forest Guardians v. U.S. Fish and Wildlife Serv.*, 611 F.3d 692, 711 (10th Cir. 2010). In essence, NEPA requires an agency to take two separate steps: (i) consider reasonable

alternatives to the proposed action; and (ii) take a "hard look" at the environmental consequences of the decision. 42 U.S.C. § 4332(c)(i) - (iii). (The requirement to consider alternatives does not appear to be at issue here.) The "hard look" requirement does not dictate any particular conclusion; it merely prohibits <u>uninformed</u>, rather than <u>unwise</u> agency act. *Citizens Committee to Save Our Canyons v. Krueger*, 513 F.3d 1169, 1178 (10th Cir. 2008). Thus, to satisfy the "hard look" requirement, the agency need only consider and disclose the significant environmental impacts of its actions. *Id.*

NEPA obligations are only triggered when an agency undertakes a "major federal action." 42 U.S.C. § 4332(2)(C). Where there is no ongoing federal action being taken, NEPA's requirements are not applicable. *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 73 (2004).

### 3. NFMA

The National Forest Management Act requires the Secretary of Agriculture to "develop, maintain, and, as appropriate, revise land and resource management plans" for lands in the National Forest System, and provides requirements as to what such plans must contain. 16 U.S.C. § 1604(a), (f). The statute is primarily procedural in nature, setting out <u>how</u> a plan is to be created (*e.g.* "in one document," "embodied in written material," created "by an interdisciplinary team"), but contains few substantive requirements to be followed once a plan is created. At most, the statute requires that plans "be revised from time to time when the Secretary finds conditions in a unit have significantly changed." 16 U.S.C. § 104(f)(5).

### 4. Pertinent Executive Orders

Executive Order 11,644, signed in 1972, was intended to "establish policies and provide for procedures that will ensure that the use of off-road vehicles on public lands will be controlled

and directed so as to protect the resources of those lands." It provided that "[e]ach respective agency head shall develop and issue regulations . . . to provide for administrative designation of the specific areas and trails on public lands on which the use of off-road vehicles may be permitted, and areas in which the use of off-road vehicles may not be permitted," and set forth specific factors that the agency should consider in declaring whether a given area or trial would permit motorized use.

Executive Order 11,989, signed in 1977, amended Executive Order 11,644 to provide that an "agency head shall, whenever he determines that the use of off-road vehicles will cause or is causing considerable adverse effects on the soil, vegetation, wildlife, wildlife habitat or cultural or historic resources of particular areas or trails of the public lands, immediately close such areas or trails to [such vehicles], until such time as he determines that such adverse effects have been eliminated and that measures have been implemented to prevent future recurrence."

Courts have concluded that, although the Executive Orders themselves create no private right of enforcement, noncompliance with their requirements can be litigated under the APA. *Defenders of Wildlife v. Salazar*, 877 F.Supp.2d 1271, 1303-04 (M.D.Fl. 2012).

### B. Claims arising out of June 2010 Order

The Respondents contend that no cognizable claim arises with regard to the June 2010 Order because that order did not constitute any new determination or action by the USFS with regard to the trails at issue here; rather, the Order simply carried forward existing USFS policy that permitted motorized use on trails previously designated as such.

The Court finds merit in this contention. The stated purpose of the June 2010 Order was to prevent adverse environmental effects "resulting from <u>cross-country</u> (off of NFS roads or motorized trails) use of motorized vehicles." (Emphasis added.) Nothing in the Order or the

pre-decision documents in the record indicate that the Order was intended to change or newly designate trails as open or closed to OHVs.  Indeed, a June 16, 2010 letter from Mr. Stiles explaining the decision underlying the Order made clear that "No change in current road and trail designations (location or type of use) occur[s] under this decision."

The Petitioner insists that the June 2010 Order the effect of "authoriz[ing] OHV use on trails."  To the extent the latter proposition is valid, it is only to the extent that the reader prefaces the quoted language with the word "continues"; in other words, consistent with the justification letter quoted above (which the Petitioner acknowledges in its reply, but does not meaningfully address[10]), the June 2010 Order merely continued a pre-existing policy authorizing OHV use on the trails in question.  Notably, the Petitioner does not point to any evidence that, as a matter of practice, the USFS ever signed, marked, or otherwise identified the trails for which motorized use was prohibited.  Nor does Petitioner dispute that, historically, the trails have seen continuous motorized use for decades and have been designated as open to motorized use on USFS maps since at least 2005 (as per the Petitioner's affidavit of Robert Marion), if not earlier.

The Petitioner has, however, constructed a plausible argument that the designation of the trails as permitting OHV use – whenever that designation might have occurred – is in violation of the 1983/1992 plan documents.  The Court agrees that, at least on its face, the 1983 plan seems to suggest that OHV use is permitted only in designated "motorized corridors," namely those identified on Appendix G.  The Court is not particularly persuaded by the Respondents' attempt to explain Appendix G away as being some form of "public notice"; the title of the

---

[10]  The Petitioner insists that the justification letter's language is somehow inconsistent with the plain language of the June 2010 Order, but does not elaborate.  The Court sees no inconsistency between , on the one hand, an letter stating a newly-stated prohibition "does not restrict . . . the operation of vehicles on motorized trails," and, on the other hand, a letter stating that the order makes "no change in current road and trail designations."

13

document unambiguously indicates that it lists "Trails To Remain Open to the Public for Motorized Use Within Management Area 3A," and its text makes clear that it is purporting to list "motorized . . . corridors," the same phrase used in the plan itself to describe those portions of Management Area 3A standing as exceptions to the general rule of "no motorized use."

Things become murkier as of 1992, however. Appendix G, a veritable "smoking gun" for the Petitioner, disappears from the scene, and language suggesting that the plan is not intended to address detailed, "site specific decisions for individual . . . activities" appears, suggesting that, at least as of 1992, the plan did not make specific designations of OHV-permitted and OHV-prohibited trails. Nevertheless, the 1992 plan carries forward the language stating that trails in Management Area 3A are presumptively OHV-prohibited unless designated as "motorized corridors," even if there is no other record of the USFS specifically identifying such corridors.

The situation clarifies as a result of the 1999 Order. That Order formally adopted the 1994 San Juan Forest Map and accompanying "area table" and "road and trail table." As noted above, the Court understands that map to designate all of the trails at issue here as open to year-round OHV use. Thus, at least on the record here, the 1999 Order represents the point in time in which the USFS formally designated the trails at issue to be open to motorized use. The June 2010 Order, then, does nothing more than repeat that motorized use that has been permitted since 1999 remains permitted.

The Petitioner argues that the 1999 Order, if interpreted to open the trails to motorized use, is necessarily in conflict with the 1983 and 1992 plans. That may be true (although the Court certainly makes no findings on that point). But the time for challenging the validity of the 1999 Order expired long ago. Any claim brought against the Unite States, whether sounding

14

under the APA, NEPA, NFMA, or some other statute, is subject to a six-year statute of limitations. 28 U.S.C. § 2401(a). Thus, the Petitioner's ability the challenge the 1999 Order expired in 2005, long before this action was commenced. The mere fact that the 2010 Order continued a policy already in place does not revive the Petitioner's untimely challenge to the 1999 Order.

Having thus concluded that the 2010 Order did nothing more than continue the USFS' existing permissions for motorized use of the trails in question, none of the Petitioner's claims directed at that decision survive. No NEPA claim lies, as the 2010 Order – that is, the mere continuation of existing policies -- does not constitute a "major federal action" giving rise to NEPA requirements. *See e.g. Norton*, 542 U.S. at 72-73 (no ongoing NEPA obligations after land use plan – the "major federal action" – had been adopted). Because the 2010 Order does not constitute a "land use plan," nothing in the NFMA required the Respondents to take any particular action regarding it. And because the June 2010 Order did not make any new designation of a trail as being OHV-permitted, nothing in Executive Order 11,644 applies.

Accordingly, the Court finds that the Respondents are entitled to judgment on all claims challenging the June 2010 Order.

### C. Claims relating to trail damage

The only apparent source of the Petitioner's claim that the Respondents have acted arbitrarily and capriciously in the face of evidence of alleged trail damage would be Executive Order 11,989. *See also* 36 C.F.R. § 212.52(b)(2). As noted above, that order requires an agency head to "immediately close" any area to OHVs if "he determines that [OHV] use will cause or is causing considerable adverse effects to soil, vegetation, wildlife, wildlife habitat, or cultural or historic resources." *Defenders of Wildlife*, 877 F.Supp.2d at 1278.

The predicate to agency action under Executive Order 11,989 is a finding by the agency head that OHV use is causing "considerable adverse effects." Thus, a claim under the APA will lie only if, in determining whether "considerable adverse effects" are occurring, the agency head acted arbitrarily and capriciously. As discussed above, the Court grants considerable deference to agency decisions, especially where the challenged decision involves technical or scientific matters within the agency's area of expertise. *Bosworth*, 443 F.3d at 739; *see also Idaho Conservation League v. Guzman*, 766 F.Supp.2d 1056, 1077 (D.Id. 2011) ("a great deal of discretion as a considerable range of evidence and opinion would be permissible in a finding of 'considerable adverse effects'").

Here, the record reflects that various parties wrote to the Respondents during the public comment period relating to the 2009 Travel Management Plan, some of whom mentioned particular adverse effects that had resulted from OHV use on the trails at issue. The Respondents replied, acknowledging the concerns, but noting that the trails were designated for motorized use and, implicitly finding that the alleged effects were not sufficiently significant to warrant closure. The record also reflects that the Petitioner advised the Respondents of other instances of adverse effects on the trials in correspondence immediately prior to this litigation. However, it is evident that the Respondents considered the evidence submitted by the Petitioner and dispatched crews to examine and, if necessary (and possible), repair the alleged damage.

The Court need not recite in detail the particular contentions and responses by the parties on this point; it is sufficient to note that, in light of the considerable deference granted to the Respondents over matters concerning what constitutes "considerable adverse effects," the Court cannot say that the Respondents have acted arbitrarily and capriciously in evaluating the Petitioner's contentions of OHV-induced environmental effects. The Petitioner may certainly

believe that the Respondents are not heeding its concerns, but in light of the record reflecting that the Respondents have at least acknowledged and addressed those concerns in some level of detail, the Court is not inclined to "step into the shoes of the agency and interpret this evidence to command a finding" that the trails must be closed.  *See Guzman*, 766 F.Supp.2d at 1078.

Accordingly, the Court finds that the Respondents are entitled to judgment in their favor on the Petitioner's claims relating to trail damage.

## CONCLUSION

For the foregoing reasons, the Petitioner's Motion for Preliminary Injunction **(# 25)** is **DENIED** as moot.  Having adjudicated the matter on its merits, the Court directs that Clerk of the Court enter judgment in favor of the Respondents and against the Petitioner on all claims herein.

Dated this 21st day of March, 2013.

**BY THE COURT:**

*[signature: Marcia S. Krieger]*

Marcia S. Krieger
Chief United States District Judge